J-S13031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.J.Z., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 68 WDA 2024 |

Appeal from the Order Entered December 14, 2023
In the Court of Common Pleas of Lawrence County Orphans' Court at
No(s):  20007 of 2023

BEFORE:   KUNSELMAN, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:                **FILED: June 6, 2024**

J.M.S. (Maternal Uncle), who had primary physical and sole legal custody of his 10-year-old niece, G.J.Z., (the Child), petitioned to involuntarily terminate the rights of A.K. (Mother) and C.E.Z. (Father), pursuant to the Adoption Act.  **See** 23 Pa.C.S.A. § 2511(a)(1)-(2), (b).  Maternal Uncle, and his spouse, A.S. (Maternal Aunt), intended to adopt the Child.[1] Notwithstanding the parents' struggles with addiction, the orphans' court determined that Maternal Uncle did not meet his burden and denied his petition.  Maternal Uncle appealed.  After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Maternal Uncle evidently had standing to petition for involuntary termination under 23 Pa.C.S.A. § 2512(a)(3).  As far as we can discern from the record, neither parent challenged his ability to file for termination.

The factual and procedurally history were addressed by the orphans'
court in its thorough opinion issued contemporaneously with its order:

> At the time of the Child's birth in 2013, Mother, Father and
> the Child resided with [R.K.] (Maternal Grandmother).
> Mother and Father have extensive drug addictions, and were
> admittedly addicted to heroin at the time of the Child's birth
> and throughout the Child's lifetime, which has resulted in
> periods of time in which Mother and Father were in
> rehabilitation programs. Mother and Father's drug
> addictions also resulted in criminal records which resulted in
> periods of incarceration. Throughout the first few years of
> the Child's life, Mother, Father, and the Child moved to
> numerous residences of their own, but then returned to the
> home of Maternal Grandmother following periods of rehab
> or incarceration. Although the record does not precisely
> reflect the exact timeframes, the testimony reveals Mother,
> Father, and the Child resided together for the first few years
> of the Child's life, primarily in the home of Maternal
> Grandmother.
>
> During the periods of time in which Mother or Father was
> incarcerated or in a rehabilitation facility, Mother and/or
> Father left parental responsibilities to the other parent or to
> Maternal Grandmother. Mother and Father had even
> executed informal guardianship paperwork[2] to allow
> Maternal Grandmother to care for the Child on at least two
> occasions, in 2015 and 2017, when neither Mother nor
> Father was able to provide such parental care. It is
> undisputed that during the periods of time in which Mother
> and/or Father were residing in the home of Maternal
> Grandmother, they fulfilled the parental role and performed
> the parental duties for the Child. The record is unclear as
> to when Mother and Father separated and were no longer
> residing together. However, the testimony reveals that

---

[2] In one instance, the paperwork was a looseleaf piece of paper, signed by
Mother, giving "guardianship" of the Child to Maternal Grandmother. The
paper was not filed with the court, but it was notarized. **See** Exhibit 2. In
another instance, the paper was typed and notarized, but not otherwise filed.
**See** Exhibit 3.

Mother was far more engaged in the custodial responsibilities than Father was.

The testimony was given in timeframes relating to the Child's school years. In the years 2018 through 2019, when the Child was in kindergarten, the Child was residing with Mother in New Castle, Pennsylvania. The Child attended kindergarten in the New Castle area. In the years 2019 through 2021, when the Child was in first and second grades, the Child was residing with Maternal Grandmother in Volant, Pennsylvania. During this period of time, the Child was enrolled in the Grove City Area School District. Mother was incarcerated at some point during this time period. Upon her release from incarceration, Mother opted to have the Child continue to reside with Maternal Grandmother so as to not disturb the Child's schooling. Mother lived with her boyfriend, but Mother would stay at the home of the Maternal Grandmother during the week to assist in caring for the Child and getting the Child on and off the school bus. On the weekends, Mother would take the Child to her home[.]

In the years 2021 through March of 2022, when the Child was in third grade, the Child was residing with Mother and Mother's boyfriend in New Castle, Pennsylvania. The Child was residing with Mother in March of 2022 when Mother overdosed while the Child was [] home. Mother was hospitalized and Maternal Grandmother picked up the Child and asked Maternal Uncle and Maternal Aunt if the Child could stay with him so the Child would not have to be uprooted from school. At that time, the Child went to live with Maternal Uncle and Maternal Aunt and continued to attend third grade in New Castle. The Child was enrolled in the Laurel School District in fourth grade and is currently in fifth grade at Laurel School District. The Child has continued to reside with Maternal Uncle and Maternal Aunt to date.

On April 29, 2022, Maternal Uncle filed a complaint for custody[.] A custody conciliation conference was held on May 29, 2022, before the custody conciliation officer. By final custody order dated May 29, 2022, Maternal Uncle was awarded primary physical custody and sole legal custody of the Child, subject to the periods of supervised visitation between the Child and [the parents] at the Cray Visitation House. The final custody order [] further directed that

- 3 -

reunification counseling occur between [the parents] and the Child with Stephanie Elisco [(a counselor)]. The parties were further ordered to sign up for AppClose to discuss matter[s] regarding the Child.

Maternal Uncle filed the instant petition for involuntary termination of parental rights on February 13, 2023 and a hearing was scheduled for April 6, 2023. The hearing was continued upon motion of Maternal Uncle, as service on Father had not been effectuated and the hearing was continued to June 14, 2023. Upon motion of the Maternal Uncle, [legal counsel] was appointed [] for the Child by order of court dated April 20, 2023. The evidentiary hearing was continued at the June 14, 2023 hearing, as Father requested the court to appoint [him] counsel.

Orphans' Court Opinion, dated 12/14/23 (O.C.O.), at *2-4 (not paginated) (style adjusted).

The orphans' court eventually held the termination hearing on October 2, 2023. The court heard testimony from the Child, Maternal Uncle, Maternal Aunt, Mother, Father, Maternal Grandmother, and Mother's probation officer. On December 14, 2023, the orphans' court issued an order denying Maternal Uncle's petition.

Maternal Uncle timely filed this appeal. He presents the following three issues for our review, which we have re-ordered for ease of disposition:

1. Whether the orphans' court committed an abuse of discretion or error of law in denying the petition to involuntarily terminate the parental rights of Father and Mother?

2. Whether the orphans' court committed an abuse of discretion in finding that the parents' remedied the conditions which caused the Child to be without essential care?

3. Whether the orphans' court committed an abuse of discretion or error of law in failing to consider the Child's testimony as an element of the burden of proof?

Maternal Aunt's Brief at 4.[3]

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 265 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive

---

[3] In his concise statement, Maternal Uncle raised 10 issues. Those issues have been preserved for our review, because they are either substantially similar to – or fairly suggested by – the three issues listed in the statement of questions involved section of his appellate brief. *See* Pa.R.A.P. 2116. We caution counsel, however, that a concise statement which does not comply with Pa.R.A.P. 1925(b)(4) is subject to waiver.

case involving…the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports the trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); *see also T.S.M.*, 71 A.3d at 267.

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted).

Instantly, Maternal Uncle petitioned for termination under 23 Pa.C.S.A. § 2511(a)(1), (a)(2) and (b). Because the orphans' court denied termination under both grounds under Section 2511(a), the court did not reach Section 2511(b). However, the court said that even if it were to consider Section 2511(b), termination was not warranted under that subsection either.

Our discussion begins with Maternal Uncle's first issue, which corresponds with orphan's court's findings under Section 2511(a)(1). That subsection provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

Of importance is the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition when evaluating a parent's conduct. Application of this timeframe is nuanced.

> Although courts are to avoid the mechanical application of the Adoption Act, we may not ignore that the General Assembly has drawn focus to the six months immediately preceding the filing of the termination petition. Indeed, quite recently [our Supreme] Court addressed this aspect of Section 2511(a)(1) and reaffirmed that for an analysis thereunder, the ***most critical period*** for evaluation is the six months immediately preceding the filing of the termination petition.

- 7 -

***L.A.K.***, 265 A.3d at 592 (citing ***In re Adoption of C.M.***, 255 A.3d 343, 367 (Pa. 2021)) (emphasis added).

As for "parental duties," the term is not defined in the Adoption Act, "but our courts long have interpreted parental duties 'in relation to the needs of a child,' such as 'love, protection, guidance and support.'" ***Id.*** at 592 (citing ***In re Burns***, 379 A.2d 535, 540 (Pa. 1977)). Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. ***Id.*** (citing ***C.M.***, 255 A.3d at 364). Parents are required to exert themselves to maintain a place of importance in the child's life. ***Id.*** "[T]he focus of the inquiry is on whether, under the circumstances, the parent has acted with reasonable firmness in refusing to yield to the obstacles that have prevented the performance of parental duties." ***Id.*** at 592-93 (citing ***C.M.***, 255 A.3d at 365 (providing that the inquiry focuses on whether under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship)).

Notably, the Supreme Court explained that, "even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." ***Id.*** at 593 (citation and internal quotation omitted). Consideration of the totality of the circumstances includes evaluation of the

following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to re-establish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). *Id.* (citing *C.M.*, 255 A.3d at 365) (further citations omitted). By conducting this inquiry, courts avoid the mechanical application of the Adoption Act. *Id.*

Our Supreme Court's decision in *L.A.K.* demonstrates just how much discretion is afforded to the trial court, sitting as factfinder. In that case, the mother sought to terminate the father's rights to facilitate a stepparent adoption. The mother and father separated several years earlier due to his alcoholism; the children were three years old and seven months old. After the separation, the father obtained supervised custody, which he could only exercise in the presence of a therapist, for whose services the father had to pay the cost. The father said he never exercised supervised custody under this order, because he did not want the children to see him grappling with his addiction. His path to sobriety took years. He went to multiple in-patient treatment centers, and he went to Alcoholics Anonymous every day for three months (approximately 500 times by the time the court held the termination hearing). Meanwhile, the father had not performed any parental duties. In fact, the father waited an entire year *after* achieving sobriety before he contacted the children. He said did not want to risk traumatizing them if he

relapsed. A week after father filed for a custody modification, mother filed for termination. *See generally id.* at 583-85.

Critically, the trial court was satisfied by the father's explanation for his conduct – *i.e.*, the reasons why he failed to perform his parental duties under Section 2511(a)(1). The trial court credited the father's testimony and determined that, while his alcoholism was a barrier to fulfilling his parental duties, he exercised reasonable firmness to overcome that barrier. *Id.* at 595. The court denied the mother's termination petition. On appeal, this Court reversed.

According to our Supreme Court, this Court misapplied the abuse-of-discretion standard of review. Rather than determining whether the trial court's findings of fact were supported by evidence of record, the High Court said we reviewed the record *de novo* and essentially made our own credibility determination and findings of fact. *Id.* Our Supreme Court's explanation of our mistake in *L.A.K.* is central to our analysis in this case.

What constitutes a "barrier to fulfilling parental obligations," and whether the parent has exercised reasonable firmness to overcome that barrier, are questions that must be answered by the trial court. Moreover, in cases like the matter before us, the answers to those questions turn on witness credibility.[4] As such, the trial court's determinations are subject to an

_____

[4] In this case, like *L.A.K.* and *C.M.*, the petitioning party is a family member, as opposed to a child protective services agency. This is an important
*(Footnote Continued Next Page)*

- 10 -

abuse of discretion review: "What constitutes a 'barrier' in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case." ***Id.*** at 593; 595 (citing ***In re M.A.K.*** 414 A.2d 1053, 1054 (Pa. 1980)).

Instantly, the orphans' court determined that neither Mother nor Father performed parental duties within the critical six-month period. At that point, the orphans' court considered the totality of the circumstances, including the parents' explanations for their conduct. Like in ***L.A.K.***, the orphans' court credited the parents' explanations and determined that termination was not warranted under Section 2511(a)(1):

> [T]he testimony clearly reveals that both Mother and Father have always expressed a desire to remain a part of the Child's life and to maintain parental claim to the Child. As described above, the family dynamic has always been inconsistent with Mother and Father moving around a lot and periods of incarceration and rehabilitation. However, it is uncontroverted testimony that although the Child was residing with Maternal Grandmother at times, Maternal Grandmother testified "when [Mother or Father] lived with me, I did not have to take the parents –the place of the parents. They did it." [(N.T., 10/2/23, at 90)]. Mother resided with Maternal Grandmother and the Child for the majority of the time, being absent during periods of

---

distinction. In agency cases, the parent's inability and unwillingness to fulfill parental obligations is well-documented; by contrast, when a parent (or a close relation) initiates a termination action against another parent, there will be no prior external examination of the respondent-parent's conduct. ***See L.A.K.***, 265 A.3d at 598, n.10 (discussing ***C.M.***, 255 A.3d at 369)). Thus, in cases like the one at bar, much of the evidence is based on witness testimony, which in turn depends on the court's credibility assessment.

incarceration and rehabilitation. Father was not residing with the Child, whether in the home of Mother or Maternal Grandmother. However, Father did maintain visits with the Child at the home of Maternal Grandmother and sent money, on occasion, to Maternal Grandmother.

In relevant part, both Mother and Father attempted to contact the Maternal Uncle numerous times while the Child was in his care following the Mother's overdose in March 2022. By admission of the Maternal Uncle, both Mother and Father were blocked from contacting him. Maternal Uncle testified that Father would call him numerous times and he would not answer and further testified that he blocked Father from contacting him because 'he would call me constantly.' (N.T. at 53). At one point, Father had even borrowed a friend's phone to contact Maternal Uncle, to which Maternal Uncle was also unreceptive. Maternal Uncle also testified that he had "[Mother's] number blocked for a long time." (N.T. at 56).

The parties were ordered to register for the AppClose app by the final custody order dated May 29, 2022. Maternal Uncle never signed up for the AppClose app, as ordered, as he was under the impression that he was not required to sign up for it until Mother and Father began supervised visitation at the Cray Visitation House. Father never registered for the AppClose app, as he testified he was never served with the custody order and was unaware of the requirement to sign up for AppClose until meeting with his attorney in preparation for the instant hearing. Mother was the only party to register for the AppClose app and had sent requests to Maternal Uncle numerous times. However, since Maternal Uncle had Mother blocked and he did not register for the app, Mother's registration was useless, as no communication regarding the Child could occur.

As noted above, Mother and Father were awarded supervised visitation with the Child through the Cray Visitation House by the final custody order[.] Mother and Father were ordered to contact the Cray Visitation House to arrange for visitation. Father was residing in a rehabilitation program at the time of the custody conciliation conference and testified that he was never served with the final custody order[.] However, Father learned of the supervised visitation through communication with Mother. Father

testified that he contacted Cray Visitation House four to five times and could not get through to the agency to arrange for visitation. Mother was able to contact the Cray Visitation House following the custody conciliation conference but was informed they did not have enough staff to cover the three-hour visitations as ordered and they would call when they would be able to accommodate the visitations. Mother was subsequently incarcerated again. Upon release, Mother contacted the Cray Visitation House again to arrange for visitation, but "it was too far down the road."

The final custody order [] also ordered the Child to engage in reunification counseling with Stephanie Elisco. Maternal Uncle testified that the minor child attended reunification counseling with Stephanie Elisco for "maybe a month" (N.T. 69). Maternal Uncle explained, "I didn't feel Stephanie Elisco was getting through to her. That and her mother tried to visit her there. Stephanie was going to allow it..." ( N.T. 70). Maternal Aunt also testified that her and Maternal Uncle decided to switch therapists because they felt the Child was not ready to begin reunification with Mother and Father.

[The orphans' court] finds that neither Mother nor the Father evidenced a settled purpose of relinquishing parental claim to the minor child. In relevant part, following the Child residing with Maternal Uncle following Mother's overdose in March 2022, Mother and Father continued to maintain parental claim to the minor child, as they both appeared at the custody conciliation conference and both attempted to maintain contact with Maternal Uncle, albeit unsuccessfully, as described above. Their attempts to maintain contact were affirmatively thwarted by Maternal Uncle and Maternal Aunt. Even pursuant to the final custody order of court, both parents attempted to arrange for visitation with the Child at the Cray Visitation House.

[The orphans' court] finds that during the six months immediately preceding the filing of the petition for involuntary termination of parental rights, neither Mother nor Father performed parental duties for the Child. However, this court finds, as a matter of law, that the parent's explanation and the circumstantial evidence does not clearly warrant termination of parental rights. Maternal Uncle was exercising physical custody of the minor child pursuant to a court order and was affirmatively blocking

> Mother and Father from maintaining a parental role. Additionally, both Mother and Father were actively engaged in drug treatment programs during this period of time. In view of the totality of the circumstances, this court finds the evidence does not support the involuntary termination of the parental rights of Mother or Father pursuant to Section 2511(a)(1) of the Adoption Act.

O.C.O. at *6-10 (style adjusted).

On appeal, Maternal Uncle acknowledges our deferential abuse-of-discretion standard of review. He says he understands that we may not reverse just because the record supports a different result, (**see, e.g., In re P.Z.**, **supra**), but he still maintains that his case is distinguishable from **L.A.K.** Specifically, Maternal Uncle argues that neither Mother, nor Father, performed any affirmative act within the critical six-month period immediately preceding the termination petition. **See** Maternal Uncle's Brief at 15. In **L.A.K.**, by contrast, the respondent-father filed for custody immediately prior to the petitioner-mother's filing for termination. According to the Supreme Court, enforcement of one's legal rights is an affirmative parental duty and, in that case, one that was performed within the critical six-month period.

This distinction, though important, does not carry the weight that Maternal Uncle believes it should. While it is true that the six-month period is the most critical timeframe to evaluate the parents' conduct, their failure to perform their duties within that period does not end the analysis. At that point, the court considers the totality of the circumstances: "[E]ven where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section

2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *L.A.K.* at 593. Consideration of the "totality of the circumstances" includes the three-part test, as "blessed in *C.M.*" and re-affirmed in *L.A.K. See id*. at 595.

First, the orphans' court had to consider the parents' explanation for their conduct. Like in *L.A.K.*, the orphans' court was persuaded by the parents' justifications. The court determined that Mother and Father always performed the parental duties, except for when they were incarcerated or in rehab. Certainly, the parents had been in the throes of addiction, which had rendered them incapable of parenting. However, the court determined that, throughout the Child's life, the parents had either performed parental duties or attempted to obtain sobriety. Their addiction constituted a self-imposed barrier to fulfilling their parental obligation, but they exercised reasonable firmness to overcome that barrier. Their most recent commitment to sobriety has been lasting. Father had been sober for two years at the time of the termination hearing; Mother for 14 months.

Certainly, the court would have been well within its discretion to dismiss the parents' explanation – *i.e.*, that they were appropriate parents except for when they were on drugs or in prison. But as *L.A.K.* makes clear, whether the parent has exercised reasonable firmness to overcome the barrier to parental duties is a determination within the purview of the trial court. We

may review that decision, but only under our deferential standard. We cannot substitute our judgment for that of the orphans' court, and in this case, we do not find the court's acceptance of the parents' explanation to be manifestly unreasonable.

Second, the orphans' court had to consider the parents' post-abandonment contact (if any), including their efforts to re-establish contact with the Child. This factor was most essential to the court's decision to deny the termination petition – and for good reason. Our Supreme Court explained that "a parent's efforts to enforce his or her legal custody rights unquestionably establishes the affirmative performance of a positive parental duty, and that when such action is taken in the face of a [custodian's] efforts to thwart access to the child, the attempts to enforce custodial rights provide evidence that is highly relevant to the question of whether the requirements of Section 2511(a)(1) have been met." **L.A.K.**, 265 A.3d at 594 (citing **C.M.**, 255 A.3d at 367)).

Here, the court clearly credited the parents' efforts to contact the Child after Maternal Uncle assumed custody of the Child. Until her overdose and subsequent incarceration, Mother had been the Child's caregiver, even though the Child technically resided with Maternal Grandmother to stay in the same school district. Although Father had, by that point, allowed Mother to do most of the child-rearing, he demonstrated his commitment to the Child when he attended the child custody conciliation to enforce his rights. Maternal Uncle responds that the conciliation took place outside of the critical six-month

timeframe. While that is true, it does not render Father's action wholly irrelevant, especially since Maternal Uncle then thwarted his access.[5]

By his own admission, Maternal Uncle blocked the parents' phone numbers. Even so, the parents tried other avenues. Mother attempted to use the AppClose app, as instructed by the custody order. Maternal Uncle did not sign up for the app, so Mother's efforts were in vain. Father borrowed a friend's phone to bypass Maternal Uncle's block. The orphans' court determined that the parents attempted to maintain a relationship with the Child, and that they exercised reasonable firmness to overcome the barrier created by Maternal Uncle. That determination is within the court's discretion, and upon review, one that is supported by the record.

The third factor the orphans' court had to consider in its "totality of the circumstances" analysis was "the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." *Id.* at 593 (citing *C.M.*,

_____

[5] Maternal Uncle relies on the distinctions from *L.A.K.* to support his argument, but he overlooks one particular distinction that undermines his position.

In *L.A.K.*, the father did not contact the children for years, even though mother did not prevent him from doing so; she never changed her phone number or her address. Yet, the court still determined that father never relinquished his parental claim.

In dissent, the late Chief Justice Baer recognized the importance of such a fact: "This is not a case where [the f]ather was unable to contact [the c]hildren." *L.A.K.*, 265 A.3d at 601 (Baer, C.J. – Dissenting).

Here, by contrast, the orphans' court determined that Maternal Uncle actively thwarted the parents' attempts to maintain a relationship.

255 A.3d at 365; ***Charles E.D.M.***, 708 A.2d at 92; ***In re Adoption of Atencio***, 650 A.2d 1064, 1066-67 (Pa. 1994)).  Elsewhere in its decision, the Supreme Court states that the third element is the "effect that termination would have on the child[]'s physical and emotional needs, as contemplated by Section 2511(b)." ***Id.*** at 595.[6]

The orphans' court noted the existence of this third element under ***L.A.K.*** in its opinion accompanying the final order, but it was otherwise silent as to the effect termination would have on the Child.  Instead, the court believed – quite logically – that any analysis under Section 2511(b) was unnecessary since Maternal Uncle did not prove termination under Section 2511(a), the first prong of the bifurcated analysis.  ***See*** O.C.O. at *11-12; ***see also C.M.K.***, 203 A.3d at 261-62.

Although the orphans' court determined that a Section 2511(b) discussion was superfluous, the court explained (albeit briefly) that termination would not have been warranted under Section 2511(b), assuming *arguendo* that Maternal Uncle established grounds under Section 2511(a).  ***Id.***

---

[6] The Supreme Court's reference to Section 2511(b), insofar as it should be considered as part of a Section 2511(a)(1) inquiry, is perplexing.

As best we can tell, the Supreme Court requires an examination of "the effect that termination of parental rights would have on the child" – identical to the examination conducted under Section 2511(b) (***but see Interest of K.T.***, 296 A.2d 1085, 1109-11 (Pa. 2023)) – when considering the "totality of the circumstances;" the court considers the "totality of the circumstances" only after the petitioner establishes that the respondent-parent failed to perform parental duties within the critical six-month period set forth in Section 2511(a)(1).

In reaching this conclusion, the court conceded that the Child said she wanted to be adopted by Maternal Aunt and Uncle. However, the court weighed the Child's preference against her testimony that she wanted to have a relationship with Mother and Father if they remained clean and sober – to say nothing of the fact that Maternal Uncle prevented Mother and Father from contacting the Child.

On appeal, Maternal Uncle does not claim that the orphans' court erred when it failed to consider this third factor in its "totality of the circumstances" analysis. Maternal Uncle's only argument – tangentially related to the matter at hand – was that the court should have weighed the Child's adoption preference more heavily. This claim (discussed in detail *infra*) is meritless. While the Child's preferred outcome is certainly a relevant factor, Maternal Uncle may not dictate how much weight the court places on the Child's preferred outcome. ***See, e.g., A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014) ("The parties cannot dictate the amount of weight the trial court places on evidence.").

In sum, although neither parent performed parental duties during the critical six-month period, the court accepted the parents' explanations and, upon consideration of the totality of the circumstances, concluded that termination was not warranted under Section 2511(a)(1). The orphans' court was persuaded by the parents' commitment to sobriety and determined that they exercised reasonable firmness to overcome their struggles with addiction. The court also found that the parents attempted to maintain a relationship

with the Child but were thwarted by Maternal Uncle.  We do not find the court's conclusions to be manifestly unreasonable.  That the record could support a contrary conclusion is not a basis for reversal.  Maternal Uncle's first issue merits no relief.

In his second appellate issue, Maternal Uncle argues that the orphans' court abused its discretion when it found that termination was not warranted under Section 2511(a)(2), which provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> […]
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To terminate parental rights under Section 2511(a)(2), the petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *C.M.K.*, 203 A.3d at 262.  The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010).  Parents are

required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Id.*

Here, the orphans' court determined Maternal Uncle met the first two prongs of the Section 2511(a)(2) analysis:  the parents' addiction constituted parental incapacity; and that such incapacity caused the Child to be without essential parental care.  However, the court ruled that Maternal Uncle did not satisfy the third prong – namely, that the parents cannot or will not remedy such incapacity.  The court determined that both parents have now achieved sobriety:

> With regard to Father, [he] began his sobriety on September 19, 2021.  Father testified as to his steps to obtain sobriety, as follows:  "I went to rehab.  I was ordered 30 days.  I felt like that wasn't enough.  I stayed there three months.  That was at Twin Lakes.  I went to Davis Archway.  It's a halfway house.  I completed the program in three months.  I decided to stay there six months.  Immediately after that, I went to a sober living house, which I am still there.  I still have a couple meetings a week…." (N.T. at 146).  Father enrolled in rehab in [September] 2021 and has remained enrolled in rehabilitation to date.  He presently lives in a three-quarter rehabilitation home and maintains his sobriety.
>
> Mother entered into the Lawrence County Drug Treatment Court Program on November 3, 2022, while she was incarcerated in the Lawrence County Jail for the charge of endangering the welfare of the Child.  On November 4, 2022, Mother was picked up from the Lawrence County Jail and transported to an in-patient treatment facility at Resolutions Recovery, located in Farrell, Pennsylvania.  Mother successfully completed the program at Resolutions Recovery on January 9, 2023.  Mother then transferred there until April 4, 2023. According to her probation officer, Mother continues to be enrolled in the Lawrence County Drug Treatment Court Program and has tested negative for all substances since retuning home from rehabilitation.

> Mother is set to graduate from the Lawrence County Drug Treatment Court Program in the Fall of 2024 and maintains her sobriety.

O.C.O. at *11-12 (style adjusted).

On appeal, Maternal Uncle notes the parents' history of addiction, including the years prior to the Child coming into his care, and emphasizes the newness of the parents' sobriety. He cites these facts to argue that the parents' efforts should have been discounted. **See** Maternal Uncle's Brief at 31 ("In all, as is obvious, the termination statute and supporting case law emphasize time. The statute provides for review of the six months preceding the filing of a petition."). In making this argument, Maternal Uncle seems to conflate Section 2511(a)(2) with Sections 2511(a)(1), or perhaps (a)(6) or (a)(8), which include temporal criteria. Under subsections 2511(a)(1), (a)(6), and (a)(8), the orphans' court "shall not consider any efforts by the parent to remedy the conditions…which are first initiated subsequent to the giving of notice of the filing of the petition." **See** 23 Pa.C.S.A. § 2511(b). Section 2511(a)(2), by contrast, does not forbid the court from considering such efforts. But even if that were the standard the court had to utilize, we note that the parents first initiated their sobriety efforts well before Maternal Uncle filed the termination petition.

Additionally, Maternal Uncle argues that the incapacity has not been remedied, as evidenced by the fact that Father still lives in a three-quarter house and Mother had yet to graduate from her drug treatment program. Whether a drug-addicted parent has obtained sobriety – sufficient to remedy

parental incapacity – is an incredibly difficult question to answer. We do not close our eyes to the fact that many addicts, if not most, experience relapses on their long road to recovery. This case exemplifies that struggle. However, the orphans' court viewed the parties firsthand, and thus had discretion to assess the parents' sobriety and the risks posed to the Child. We will not substitute our judgment for that of the orphans' court. Upon review of the court's determinations under Section 2511(a)(2), we discern no abuse of discretion. Maternal Uncle's second appellate issue merits no relief.

In his third appellate issue, Maternal Uncle claims the orphans' court erred when it failed "to consider the Child's testimony as an element of the burden of proof." **See** Maternal Uncle's Brief at 19. We alluded to this argument **supra.** Maternal Uncle essentially argues that the court should have assigned the Child's preference near-dispositive weight. For support, Maternal Uncle cites the Adoption Act's mandate that children be appointed legal counsel to represent their preferred outcome in contested termination matters. **See id.** at 25; **see also** 23 Pa.C.S.A. § 2313(a); **and see In re P.G.F.**, 247 A.3d 955, 963 (Pa. 2021) ("The termination of parental rights is a grave matter…. For this reason, our General Assembly has mandated that children be given a voice in termination proceedings."). According to Maternal Uncle, given the General Assembly's recognition of the importance of a child's preferred outcome, it follows that the preference should be determinative of whether termination is warranted. He reasons: "Th[e] importance of a child's voice has been statutorily prescribed. Therefore, in the instant case, the

Child's testimony should have received the treatment which has been ascribed to by the General Assembly." *Id.* at 26. Maternal Uncle concludes that the orphans' court gave the Child's testimony "near-trivial treatment." *Id.*

Maternal Uncle's argument is without legal foundation. A child's preferred outcome, though important to the court's analysis, is not an element of any ground under Section 2511.[7] By Maternal Uncle's logic, the parents' preferred outcome would also have to be assigned dispositive weight, because the General Assembly has also mandated their appointment of counsel. *See* 23 Pa.C.S.A. § 2313(a.1). As referenced above, parties cannot dictate the amount of weight the court puts on evidence, and the orphans' court, sitting as factfinder, has discretion to assess the witnesses firsthand. *See A.V., supra*; *see also T.S.M., supra.* That notwithstanding, there is no indication that the orphans' court ignored or otherwise trivialized the Child's compelling testimony or preferred outcome. Maternal Uncle's third issue merits no relief.

To conclude: the orphans' court did not abuse its discretion or commit an error of law when it determined that, under the totality of the circumstances, termination under Section 2511(a)(1) was not warranted at this time, notwithstanding the parents' failure to perform parental duties. Moreover, the court did not abuse its discretion or commit an error of law when it determined that the parents remedied their incapacity under Section

---

[7] We note that the Child was appointed proper counsel under Section 2313(a), who advocated for termination.

2511(a)(2). Finally, the court consideration of the Child's testimony and preferred outcome was appropriate.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/06/2024